*Petition*

# SUMMONS

## IN THE CIRCUIT COURT OF JACKSON COUNTY, WEST VIRGINIA

CIVIL ACTION NO.

**KEVIN GERHOLD, on behalf of himself
and all others similarly situated,**

     **Plaintiff,**

v.                                                                 SUMMONS

Lifelock, Inc.
60 E. Rio Salado Parkway
Tempe, Arizona  85281,

     **Defendant.**

**To the above named Defendant:**

     **IN THE NAME OF THE STATE OF WEST VIRGINIA,** you are hereby summoned and required to serve upon **David L. Grubb and/or Kristina Thomas Whiteaker, Attorneys at Law,** Plaintiff's attorneys, whose address is **1324 Virginia Street, East; Charleston, WV 25301,** an answer, including any related counterclaim you may have, to the complaint filed against you in the above-styled civil action, a true copy of which is herewith delivered to you.  You are required to serve your answer within **30 days** after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint and you will be thereafter barred for asserting in another action any claim you may have asserted by counterclaim in the above-styled civil action.

Dated: *May 12 2008*

*Keith Brotherton*
Clerk of Court

**EXHIBIT**

A

**IN THE CIRCUIT COURT OF JACKSON COUNTY, WEST VIRGINIA**

**KEVIN GERHOLD, on behalf of himself**
**and all others similarly situated,**

     **Plaintiff,**

**v.**                                         Civil Action No. _08-C-69_

**LIFELOCK, INC., a Delaware Corporation;**
**RICHARD TODD DAVIS, a citizen of the State of**
**Arizona, and JOHN DOES 1 through 10, Inclusive,**

     **Defendants.**

## COMPLAINT

     COMES NOW the Plaintiff, Kevin Gerhold, individually, and on behalf of all others similarly situated, by and through his counsel, Marks & Klein, LLP, and The Grubb Law Group, and hereby brings this action against Defendants, LifeLock, Inc., Richard Todd Davis, and John Does 1 through 10 (collectively, "Defendants").

     In support thereof, Plaintiff alleges as follows:

### I.     NATURE OF THE CASE

     1.     This is a class action lawsuit brought by, and on behalf of, West Virginia subscribers of LifeLock, Inc., a company that holds itself out as "the industry leader in the rapidly growing field of Identity Theft Protection."

     2.     This matter arises from the deceptive business practices and fraudulent advertising campaign implemented by LifeLock, Inc. ("LifeLock"), its agents, employees, servants, and representatives, through which it has induced nearly one million individuals, including Plaintiff and the Putative Class in the state of West Virginia, into subscribing to the

1

identity theft protection services the company purportedly provides.

3.    To induce consumers across the country to subscribe to its services, LifeLock claims in its advertisements that it will prevent any possibility of identity theft, in any form.

4.    In LifeLock's ubiquitous marketing campaign, the company's Chief Operating Officer ("CEO"), Richard Todd Davis ("Davis"), cavalierly broadcasts his own social security number – 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 – on television and radio stations across the country, proclaiming his unwavering confidence in LifeLock's purported protections.

5.    In reality, however, LifeLock simply does not provide the level of identity protection that it advertises in its deceptive marketing campaign.

6.    Contrary to the all-encompassing identity protection LifeLock advertises, its protection only extends to limited, credit-related instances of identity theft.

7.    Even in those limited credit-related instances, LifeLock does not necessarily protect its subscribers' identities as advertised.

8.    Indeed, the representations made by LifeLock's CEO are false and misleading because his own identity was stolen while he was a LifeLock customer.

9.    While LifeLock has only publicly acknowledged that Davis's identity was compromised on one (1) occasion, there are more than twenty (20) driver's licenses that have been fraudulently obtained through the misappropriation of Davis's personal information.

10.    Furthermore, a simple background check performed using Davis's social security number reveals that his entire personal profile has been compromised to the extent that the birth date associated with his social security number is November 2, 1940, which would make Davis 67 years old.  This is clearly fraudulent information.

11.     In addition to its inability to provide the level of protection it advertises, LifeLock fails to disclose and intentionally omits from its advertisements the potential **harms** that its services may have on consumers.

12.     As described in further detail below, LifeLock's services can actually have an **adverse** impact on the consumer's ability to obtain credit or favorable interest rates.

13.     Furthermore, in its advertisements, LifeLock fails to advise or make clear to consumers that they could perform each of LifeLock's services on their own, free of charge.

14.     Instead, in the few advertisements in which LifeLock does allude to this fact, LifeLock preys on consumer fears and misleads potential subscribers into believing that the services it provides embody a complicated, time-consuming process that require LifeLock's "expertise" and assistance.

15.     LifeLock also fails to adequately disclose and intentionally omits from its advertisements that the information that the credit reports it orders on behalf of the subscribers is the **free** annual credit report, which subscribers are entitled to receive when placing their own fraud alerts, pursuant to 15 U.S.C. §1681c-(a)(2)(B).

16.     As a result, when LifeLock orders the free annual report, it renders the subscribers ineligible to order their free report for the next twelve months.  This fact is not disclosed to subscribers.

17.     LifeLock also fails to adequately disclose and intentionally omits from its advertisements the true nature and limited scope of its One Million Dollar ($1,000,000) service guarantee.

18.     Pursuant to its own terms, the service "guarantee" is severely limited due to the numerous restrictions, limitations, and waivers that are present within its terms.

19.     Finally, LifeLock fails to disclose that the methods it employs in providing its purported protection are improper and violate the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq.*

## Kevin Gerhold

20.     In or about February 2008, Plaintiff Kevin Gerhold ("Gerhold") decided to subscribe to LifeLock after listening to its advertisements on XM satellite radio.

21.     Based on those advertisements, Gerhold was lead to believe that LifeLock would provide comprehensive protection against all forms of identity theft.

22.     Gerhold's decision to subscribe to LifeLock was also heavily based on the company's purported One Million Dollar ($1,000,000) service guarantee, which, he was led to believe, would reimburse him for any financial damage sustained by a subscriber as a result of identity theft.

23.     Upon information and belief, as a result of its fraudulent campaign, LifeLock has generated nearly one million subscribers, each of whom pay approximately One Hundred and Ten Dollars ($110.00) per year for its "services."

24.     Thus, by virtue of LifeLock's deceptive scheme, its subscribers have each suffered an ascertainable loss in the form of the subscription fees they pay for services that: (a) do not provide the level of identity protection advertised; (b) may actually impair their ability to obtain credit or financing; and (c) provide a service guarantee that is, at best, illusory.

## II.     VENUE

25.     Venue is appropriate in this case as Defendants transact business within the state of West Virginia, and more specifically in Jackson County.

4

### III.    PARTIES

26.    Plaintiff Gerhold is a citizen of the State of West Virginia, residing at 251 Morningside Drive, Falling Waters, West Virginia 25419.

27.    Plaintiff Gerhold enrolled as a LifeLock subscriber in 2008.

28.    Plaintiff Gerhold is a proper party plaintiff to this action because he has suffered losses as a result of LifeLock's unlawful conduct alleged herein.

29.    Defendant LifeLock is a Delaware corporation with its principal place of business at 60 E. Rio Salado Parkway, Tempe, Arizona 85281.

30.    Defendant LifeLock maintains its principal place of business in Arizona and transacts substantial business within West Virginia and is amenable to personal jurisdiction in Virginia.

31.    Defendant Davis is a resident of Chandler, Arizona. Defendant Davis is the Chief Executive Officer of LifeLock.

32.    The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named as JOHN DOES 1 through 10, inclusive, are unknown to Plaintiff and the putative class who, therefore, sue those Defendants by such fictitious names.

33.    Plaintiff and the putative Class are informed and believe and thereon allege that each Defendants sued herein as JOHN DOES 1 through 10 are and were the agents and/or employees of each and every other Defendant and were at all relevant times acting within the course and scope of such agency and employment, and/or are legally responsible in some manner for the events and happenings herein referred to, and caused injuries and damages proximately thereby to Plaintiff and the putative Class as alleged herein.

34.   Plaintiff will seek to amend this Complaint to allege the true names and capacities of such Defendants when ascertained.

## IV.   GENERAL ALLEGATIONS

### THE HISTORY OF LIFELOCK

35.   In or about 2005, Defendant Davis and his colleague Robert J. Maynard, Jr. ("Maynard") founded LifeLock.

36.   According to the company's website, LifeLock is the "industry leader" in "proactive identity theft protection, specializing in prevention of identity theft rather than the reporting of it" (http://www.lifelock.com/lifelock-for-people/who-we-are/who-is-lifelock, as of May 5, 2008).

37.   LifeLock further claims that its identity theft protection system was purportedly developed as a result of "more than three years" of "solid research" and building "relationships with the right organizations" (http://www.lifelock.com/lifelock-for-people/who-we-are/who-is-lifelock, as of May 5, 2008).

38.   Since its inception, LifeLock's purported "goal" has been "to lock down every individual's private information so no one except that individual can approve its use" (http://www.lifelock.com/lifelock-for-people/who-we-are/who-is-lifelock, as of May 5, 2008).

### LIFELOCK'S NEFARIOUS ORIGIN

39.   Throughout its countless hours of advertising, LifeLock never discloses any of the less propitious information about its founding or its founding member, Robert Maynard.

40.   Upon information and belief, Maynard developed the idea for LifeLock while sitting in a jail cell after having been arrested for failure to repay a $16,000.00 casino marker taken out at the Mirage Hotel in Las Vegas.

6

41.     Additionally, Maynard, who previously acted as LifeLock's Chief Marketing Officer, is subject to an injunction, obtained by the FTC.

42.     The FTC has banned him for life from "advertising, promoting, offering for sale, selling, performing, or distributing any product or service relating to credit improvement services."

43.     The injunction issued against Maynard resulted from his production of misleading infomercials regarding the services provided by his credit improvement company, National Credit Foundation.

44.     Upon information and belief, these harsh sanctions were also meant to penalize Maynard for engaging in a scheme through which he arranged unauthorized withdrawals from customer accounts at National Credit Foundation.

45.     Finally, and perhaps most disturbing, is that, upon information and belief, Maynard himself has engaged in the very type of identity theft that his company purportedly sets out to eliminate, by stealing his own father's identity.

46.     Specifically, upon information and belief, Maynard misappropriated his father's identity to obtain an American Express card.

47.     Maynard then ran up over One Hundred Thousand Dollars ($100,000.00) in debt on the charge card.

48.     Eventually, American Express sued Maynard's father in an effort to recover the balance.

## THE SERVICES LIFELOCK PROVIDES

49.     According to the company's official website, a general LifeLock subscription provides four (4) services that are designed to protect its subscribers from identity theft.

7

50.     First, LifeLock "ask[s] the credit bureaus to set free fraud alerts on [the subscriber's] behalf."

51.     Second, LifeLock renews those fraud alerts "every 90 days or so."

52.     Third, LifeLock requests that subscribers' names be removed from pre-approved credit card and junk mail lists.

53.     Fourth, every year, LifeLock orders free credit reports, on behalf of its subscribers, from the major credit bureaus.

### LIFELOCK MISREPRESENTS THE SCOPE OF ITS SERVICES

54.     LifeLock deceptively markets its services through:  (a) its website located at www.lifelock.com; (b) affiliated web pages; (c) press releases; (d) news publications; (e) television commercials; and (f) radio advertisements.

55.     LifeLock knows, yet fails to disclose, that the services it provides do not offer the breadth of protection that it promotes through its massive advertising campaign.

56.     The primary service that LifeLock provides to protect against identity theft is the placement and renewal of fraud alerts on subscribers' credit profiles.

57.     The representations made in LifeLock's advertisements regarding the scope and effectiveness of fraud alerts are misleading and fail to disclose material facts regarding the limitations inherent in the service.

58.     Through its advertisements, LifeLock misrepresents and assures consumers that it can protect against all types of fraud including, without limitation, computer hacking, password theft, and other non-credit related theft.  These representations are false.

59.     In actuality, the fraud alerts LifeLock places only work to combat credit-related identity theft, which is merely one form of theft amongst many others, which include:  (a) bank

related identity theft; (b) employment related identity theft; (c) medical related identity theft; and (d) government documents or benefits identity theft.

60.     There is no conspicuous mention of this fact, nor any disclaimer in the plethora of information about the limitations of LifeLock's services on the company website or in LifeLock's advertisements.

61.     In contrast, LifeLock's advertisements create the illusion that LifeLock provides complete and comprehensive identity protection, by employing misrepresentations that include, but are not limited to, the following:

(a)     "Here's a report I have on John Sheiper, a young hacker – sent out a virus, put more than 250,000 computers to work stealing passwords to bank accounts from people around the world;"[1]

(b)     "LifeLock's own CEO is so positive our service secures identities that he has broadcast his social security number on our homepage, in our commercials, and in our media spots because he wants to prove that we can protect anyone's identity from scammers, thieves, and hackers;"[2]

(c)     "This very second, someone could be using your identity to...clear out your bank accounts...Stop it from happening now. Call LifeLock...;"[3] and

(d)     "LifeLock, the industry leader in proactive identity theft protection, offers a proven solution that prevents your identity from being stolen before it happens."[4]

## LIFELOCK MISREPRESENTS THE EFFECTIVENESS OF ITS SERVICES

62.     Through its deceptive advertisements and marketing tools, LifeLock misrepresents the effectiveness of the services it provides.

---

[1]     LifeLock radio advertisement.
[2]     *See* http://lifelockprotection.wordpress.com/2007/11/10/lifelock-protect-your-good-name, as of May 5, 2008.
[3]     LifeLock radio advertisement.
[4]     *See*  http://www.lifelock.com/default.aspx?promocode=Shareasale&SSAID=252168, as of May 5, 2008.

63.     LifeLock knows, yet fails to disclose, that the services it provides do not offer the comprehensive level of protection that is advertised to consumers through its massive advertising campaign.

64.     Specifically, LifeLock misrepresents that its subscribers will receive a telephone call each time his or her personal information is used to apply for new credit.

65.     LifeLock fails to advise subscribers that companies and institutions that issue credit **are not required by law** to contact them, even if they have fraud alerts in place.

66.     LifeLock's misrepresentations regarding the effectiveness of its services include, but are not limited to, the following:

(a)     "Once fraud alerts have been placed, you will receive a phone call — most people register their cell phone numbers — anytime someone tries to open a credit line in your name;"[5]

(b)     "If it's you trying to open the account, then you'll get the call *while you're standing there*;"[6]

(c)     "The alert *ensures* you will receive a phone call *whenever* someone –even you-tries to establish using your identifying information...;"[7]

(d)     "When someone seeks to open a new account, the creditor *will call* to confirm that it's really you through a series of identifying questions;"[8]

(e)     "If someone is trying to use your personal information, you will be contacted by the creditor that is issuing the line of credit;[9]

(f)     "You will know whenever anyone tries to use your credit before damage is

---

[5]     Statement by Defendant Davis, CEO of LifeLock, Inc., in article entitled "Fraud alerts can protect ID," www.azstarnet.com/business/202488, as of May 5, 2008.

[6]     Statement by Defendant Davis, CEO of LifeLock, Inc., in article entitled "Fraud alerts can protect ID," www.azstarnet.com/business/202488, as of May 5, 2008. (Emphasis added.)

[7]     *See* www.mylifelock.org, as of May 5, 2008. (Emphasis added.)

[8]     Statement by Defendant Davis, CEO of LifeLock, Inc., in article entitled "Protecting identity among the tell-all generation," www.startribune.com/templates/Print This Story?sid=1191451, as of May 5, 2008. (Emphasis added.)

[9]     *See* http://www.lifelock.com/lifelock-for-people/what-to-expect/who-calls-me-to-let-me-know-that-someone-is-attempting-to-obtain-credit-in-my-name, as of May 5, 2008.

10

done;"[10]

(g)   "The most important difference between LifeLock and other fraud protection services is our proactive approach to identity theft. LifeLock is not a credit monitoring service that alerts you when we find a problem, we actually stop crime *before it happens by having the credit bureaus alert you* when someone tries to make changes in your status or inquire about your credit;"[11] and

(h)   "We start by putting fraud alerts on your information with all three of the major credit card bureaus and ChexSystems, allowing only you to be able to apply for credit lines or make changes to your accounts. This is the most important step in our service because it prevents thieves from being able to use your identity, since the fraud alert *requires creditors to contact you* by the phone number listed on LifeLock's report before verifying any changes, such as extending limits or changing billing addresses."[12]

### LIFELOCK CONCEALS AND OMITS
### THE POTENTIAL HARMS THAT ITS SERVICES
### COULD HAVE ON SUBSCRIBERS' CREDIT PROFILES

67.    Through its deceptive advertisements and marketing tools, LifeLock conceals and omits the adverse effects that its services could have on its subscribers' credit profiles.

68.    LifeLock knows yet fails to disclose that the services it provides can have an adverse impact on a subscriber's credit profile.

69.    For instance, LifeLock's advertisements omit and conceal the fact that its placement and continuous renewal of fraud alerts could actually prohibit its subscribers from obtaining credit.

70.    Additionally, LifeLock's advertisements omit and conceal the fact that its placement and continuous renewal of fraud alerts could have an adverse impact on its subscribers' ability to obtain a home loan or refinance their existing loans.

---

[10]  *See* http://www.idtheftquiz.org, as of May 5, 2008.
[11]  *See* http://lifelockprotection.wordpress.com/2007/11/10/lifelock-protect-your-good-name/, as of May 5, 2008). (Emphasis added.)
[12]  *See* http://lifelockprotection.wordpress.com/2007/11/01/comparing-lifelock/, as of May 5, 2008.

11

71.     LifeLock's advertisements also omit and conceal the fact that each time a fraud alert intercepts an attempt to obtain credit, an inquiry is created on the subscriber's credit profile, which can adversely affect the subscriber's credit score.

## LIFELOCK OMITS OR CONCEALS THE TRUE ORIGIN OF THE CREDIT REPORT IT ORDERS FOR ITS SUBSCRIBERS

72.     LifeLock represents to consumers that its services include a credit report from each of the three credit bureaus every twelve (12) months.

73.     However, through its deceptive advertisements and marketing tools, LifeLock omits and conceals that the credit reports it orders on behalf of its subscribers are the free annual credit report to which subscribers are already entitled to receive without being a LifeLock subscriber.

74.     LifeLock also omits and conceals that by its ordering of the credit report, the subscribers are now rendered ineligible to order the free report on their own for the next 12 months.

75.     LifeLock further omits and conceals that ordering the free credit report from www.annualcreditreport.com is duplicative of the free credit report consumers are entitled to when placing a fraud alert under the Fair Credit Reporting Act, 15 U.S.C. § 1681c-1(a)(2)(B).

## LIFELOCK'S TERMS AND CONDITIONS ARE SUBSTANTIVELY AND PROCEDURALLY UNCONSCIONABLE

76.     The services LifeLock provides to its subscribers are governed by LifeLock's "Terms and Conditions."

77.     LifeLock's "Terms and Conditions" are presented to consumers on a take-it-or-leave-it basis, in a standardized printed form, and therefore is a contract of adhesion.

---

(Emphasis added.)

78.     None of LifeLock's subscribers, including Plaintiff and the putative class, had any bargaining power with which to negotiate the "Terms and Conditions."

79.     Additionally, the LifeLock "Terms and Conditions" include an arbitration clause that purports to prohibit class actions.

80.     This provision is meant to deter and eliminate any possibility for a consumer to seek redress for any grievances for the deceptive conduct perpetrated by LifeLock.

81.     While LifeLock purports to pay all of the costs of a subscriber's arbitration, this representation is false and misleading, as it fails to take into account the significant ancillary costs incurred as a result of the subscriber being required to arbitrate his or her individual claims in the State of Arizona.

82.     Such costs include, but are not limited to, travel to and lodging in Arizona for both the subscriber and his or her attorney.

83.     Moreover, the LifeLock "Terms and Conditions" attempt to require subscribers to pay their attorney's fees and costs, regardless of whether they prevail in any arbitration.

84.     Such attorney's fees and costs exponentially exceed the cost of LifeLock's subscription fee, which renders the individual pursuit of one's claims against LifeLock not feasible.

85.     Accordingly, the arbitration provision does not allow LifeLock subscribers, including Plaintiff and the putative class, to adequately vindicate their rights.

86.     Such a provision is so one-sided that it shocks the conscience, and is therefore unconscionable and unenforceable.

## LIFELOCK MISREPRENTS THE SCOPE
## AND NATURE OF ITS $1,000,000 SERVICE GUARANTEE

87.     LifeLock deceives consumers further by touting its "one-million dollar service guarantee."

88.     This service falsely and deceptively purports to insulate subscribers in the event LifeLock's services are ineffective.

89.     LifeLock's advertisements deceptively misrepresent the scope of its purported one-million dollar service guarantee, drastically overstating the actual value of its protections, which are essentially rendered useless by virtue of the restrictions, limitations and waivers contained within its terms.

90.     Examples of LifeLock's misrepresentations regarding its million dollar service guarantee include, without limitation, the following:

(a)     "With our million dollar guarantee, you have absolutely *nothing to lose* by signing up with us;"[13]

(b)     "If your Identity [sic] is misused while you are a member of LifeLock, we'll spend up to $1,000,000 to make it right;"[14] and

(c)     "LifeLock will pay you up to $1 million for damages stemming from the security breach. LifeLock says they will "make sure that you get every dollar back, lost wages, costs, actual losses, every dollar up to $1,000,000. Period."[15]

91.     Contrary to the representations made in LifeLock's misleading advertisements, the terms and conditions of the actual guarantee reveal protections that are significantly limited in comparison to those advertised.

---

[13]     *See* http://lifelockprotection.wordpress.com/2007/10/22/the-lifelock-guarantee/, as of May 5, 2008. (Emphasis added.)

[14]     *See* http://www.lifelock.com/lifelock-for-people.aspx, as of May 5, 2008.

[15]     *See* http://www.lifelocklife.com/million-dollar-guarantee.html, as of May 5, 2008.

14

92.     Specifically, the express terms of the Service Guarantee, at section "2," paragraph "G," disclaim as follows

> WE WILL PAY UP TO $1,000,000 TO CURE THE FAILURE OR DEFECT IN OUR SERVICE, PER CLIENT, PER LIFETIME FOR ALL INCIDENTS IN THE AGGREGATE, REGARDLESS OF CIRCUMSTANCE...WE WILL NOT MAKE PAYMENTS TO YOU FOR ANY LOSS YOU MAY INCUR. OTHER THAN OUR SERVICE GUARANTEE, AND EXCEPT AS OTHERWISE SET OUT HEREIN WE MAKE NO REPRESENTATION OR WARRANTY ABOUT OUR SERVICE OF ANY KIND, AND WE DISCLAIM ANY IMPLIED WARRANTIES OUTSIDE OF OUR SERVICE GUARANTEE, SUCH AS A WARRANTY OF MERCHANTABILITY OR FITNESS OF OUR SERVICE FOR ANY PARTICULAR PURPOSE.

93.     In actuality, the narrow terms of LifeLock's service guarantee disclaim all consequential damages and all liability for anything beyond a defect in their service.

94.     Accordingly, the service guarantee is only enforceable when LifeLock fails to properly place a fraud alert or properly request to remove the subscriber from a pre-approved credit card or junk mail list.

95.     This language is intended to mislead and deter members from asking LifeLock to cover losses or pay for consequential damages such as hiring professionals to restore their losses, and to provide LifeLock with a basis for denying any such claims.

96.     For example, assume LifeLock properly places a fraud alert on a subscriber's credit profile.  Now assume that a lender issues a credit card to an identity thief because that lender never called the subscriber.  In that case, LifeLock would avoid having to make good on its service guarantee since it properly administered its services.  This is deceptive.

97.     In further contrast with the misrepresentations in its advertisements, in the event that the Service Guarantee is triggered, LifeLock is not required to "spend up to $1,000,000.00 to

make it right" or "cover all losses and all expenses up to one million dollars" under the Terms & Conditions."[16]

98.     Rather, LifeLock would only be required to:  (a) reimburse direct expenses the subscriber incurred up to One Million Dollars ($1,000,000.00); and (b) assist and advise damaged subscribers by paying third-party professionals up to One Million Dollars ($1,000,000.00) to resolve the subscribers' damages, including, without limitation, damages to their credit profiles and credit ratings.

99.     LifeLock will not use the advertised One Million Dollars ($1,000,000.00) to actually recoup any of the subscribers' financial losses, as the advertisements lead consumers to believe.

## V.     CLASS ACTION ALLEGATIONS

100.    This action is brought as a class action pursuant to Rule 23 of the West Virginia Rules of Civil Procedure, on behalf of the named Plaintiff and all others similarly situated.

101.    The class is tentatively defined as:

> All persons in the state of West Virginia who subscribed to LifeLock, between 2005 and the present, including former residents who resided in West Virginia at the time they subscribed to LifeLock's services.

102.    Upon information and belief, the class has more than 1,000 members (including present and past subscribers).

103.    All members of the class assert claims for violation of the law as more particularly set forth herein.

104.    All class members pray for money damages.

---

[16]     *See* http://www.lifelock.com/lifelock-for-people.aspx, as of May 5, 2008.

16

105. All class members pray for temporary and permanent injunctive relief, as well as declaratory relief, because the parties opposing the class have acted on grounds generally applicable to the class, thereby making appropriate injunctive relief to the class as a whole.

106. The proposed class meets the criteria set forth for the maintenance of a class action as described below.

107. **Numerosity:** Members of the class are so numerous that their individual joinder is impractical. The precise identities, number and addresses of members of the class are unknown to Plaintiff, but may and should be known with proper and full discovery of Defendants, third-parties, and their respective records.

108. **Existence of Common Questions of Fact:** The common nucleus of operative facts to be determined for the class as a whole center upon the deceptive advertising and marketing campaign employed by LifeLock and its agents in West Virginia. The questions of fact common to class members include, but are not limited to, the deceptive advertising and marketing campaign described herein.

109. **Existence of Common Questions of Law:** There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the class. The common questions of fact and law include, among other things:

(a) Whether and to what extent Defendants' practices, conduct, and misrepresentations violate West Virginia state law;

(b) Whether Defendants engaged in any deception, unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce, within the meaning of the West Virginia Consumer Credit and Protection Act ("WVCCPA"), *W. Va. Code*

17

§46A-1-101, *et seq.*;

(c)     Whether Plaintiff and the putative class are "buyers" pursuant to the WVCCPA, *W. Va. Code* §46A-6C-1;

(d)     Whether LifeLock is a Credit Services Organization ("CSO") pursuant to the WVCCPA, *W. Va. Code* §46A-6C-2;

(e)     Whether LifeLock, as a CSO, charged or received money from Plaintiff and the putative class before completing performance of all services it had agreed to perform, in violation of WVCCPA, *W. Va. Code* §46A-6C-3(2);

(f)     Whether LifeLock, as a CSO, made or used any false or misleading representations in the offer or sale of its services in violation of the WVCCPA, *W. Va. Code* §46A-6C-3(3);

(g)     Whether LifeLock, as a CSO, engaged, directly or indirectly, in any unfair or deceptive acts, practices, or courses of business in connection with the offer or sale of its services, in violation of the WVCCPA, *W. Va. Code* §46A-6C-3(4);

(h)     Whether LifeLock, as a CSO, advertised or cause to be advertised, in any manner whatsoever, its services without filing a registration statement with the West Virginia Secretary of State, in violation of the WVCCPA, *W. Va. Code* §46A-6C-3(6);

(i)     Whether LifeLock, as a CSO, filed the requisite registration statement with the West Virginia Secretary of State, pursuant to the WVCCPA, *W. Va. Code* §46A-6C-5;

(j)     Whether LifeLock, as a CSO, before executing a contract or agreement

with, or receiving money from Plaintiff or the putative class, made the appropriate written disclosure statement pursuant to the WVCCPA, *W. Va. Code* §46A-6C-6;

(k)   Whether LifeLock, as a CSO, entered into the required form written contract or agreement with Plaintiff or the putative class, pursuant to the WVCCPA, *W. Va. Code* §46A-6C-7 and whether such contract included each of the terms prescribed by WVCCPA, *W. Va. Code* §46A-6C-7;

(l)   Whether Defendants' affirmative statements and material omissions constitute an unfair or deceptive act or practice;

(m)   Whether LifeLock's radio, television, internet and print advertisements contained fraudulent representations and omissions;

(n)   Whether the arbitration provision in the LifeLock "Terms & Conditions" is unconscionable and unenforceable;

(o)   Whether the class action prohibition provision in the LifeLock "Terms & Conditions" is unconscionable and unenforceable;

(p)   Whether the exculpatory provision dealing with attorney's fees and costs contained in the LifeLock "Terms & Conditions" is unconscionable and unenforceable; and

(q)   Whether Plaintiff and the putative class are entitled to recover compensatory, exemplary, statutory, minimum, and/or punitive damages, based on Defendants' fraudulent and illegal conduct or practices.

110.   **Typicality:**   Plaintiff is a member of the class.   Plaintiff's claims have a common origin and share common bases.   His claims originate from the same illegal and fraudulent practices of Defendants, and Defendants act in the same way toward Plaintiffs and the class members.   If brought and prosecuted individually, the claims of each putative class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

111.   **Adequacy of Representation:**   Plaintiff can and will fairly and adequately represent and protect the interests of all members of the class.   He has no interests that conflict with or are antagonistic to the interests of the class members, and intends to prosecute this action vigorously.   Plaintiff has retained counsel competent and experienced in class action and complex commercial litigation.   As such, Plaintiff's counsel will fairly and adequately protect the interests of the class.

112.   Plaintiff's counsel will fairly and adequately protect the interests of the class.

113.   **Superiority:**   A class action is superior to any other available method for the fair and efficient adjudication of this controversy, because:  (a) common questions of law and fact overwhelmingly predominate over any individual questions that may arise, such that there will be efficiencies to the courts and the parties in litigating the common issues on a class basis rather than on an individual basis; (b) the damages to some class members are larger than to others, but all claims are sufficiently small that individual prosecution of the claim would not be an economically viable alternative; (c) class treatment is desired for optimal deterrence and compensation; (d) the economies of scale inherent in litigating similar claims on a common basis will enable this case to be litigated on a cost-efficient basis as a class action, especially when compared to repetitive individual actions; (e) no unusual difficulties

are likely to be encountered in the management of this class action as the proofs as to liability are common to all class members; and (f) this action would be effectively impossible to bring as individual actions leaving plaintiffs and others similarly situated with no viable remedy.

### FIRST COUNT

#### [Violation of the WVCCPA – Unfair or Deceptive Acts or Practices]

114.    Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

115.    Plaintiff and the putative class members are "consumers" as contemplated by the WVCCPA.

116.    LifeLock's deceptive marketing and advertising campaign are "advertisements" as contemplated by the WVCCPA.

117.    As alleged with specificity in this Complaint, Defendants committed *per se* unfair and deceptive acts or practices in the course of trade or commerce – including, but not limited to, the following:

(a)    representing that the goods or services they advertise and sell have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have in violation of *W. Va. Code* §§46A-6-104 and 46A-6-102(5);

(b)    advertising goods with intent not to sell them as advertised in violation of *W. Va. Code* §§46A-6-104 and 46A-6-102(9);

(c)    engaging in conduct which creates a likelihood of confusion or misunderstanding in violation of *W. Va. Code* §§46A-6-104 and 46A-6-102(12);

(d)     acting, using or employing deception, fraud, misrepresentation, or the concealment, suppression, or omission of any material fact in violation of *W. Va. Code* §§46A-6-104 and 46A-6-102(13); and

(e)     including exculpatory provisions in its "Terms and Conditions."

118.    Defendants' conduct also constitutes general unfair or deceptive acts or practices in violation of *W. Va. Code* §46A-6-104.

119.    Along with others known and unknown, Defendant Davis caused LifeLock to engage in these *per se* and general unfair or deceptive acts or practices.

120.    Defendant Davis participated in the deceptive practices alleged in this Complaint by overseeing, directing and otherwise ratifying the action of the corporation he controls, to obtain personal financial benefits.

121.    As a result of LifeLock's unfair or deceptive acts or practices, Plaintiff and the putative class were induced to subscribe to LifeLock's services.

122.    The monthly or annual subscription fees paid by Plaintiff and the putative class constitute ascertainable losses.

## SECOND COUNT

### [Violation of the WVCCPA – Credit Services Organization]

123.    Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

124.    Plaintiff and the putative class are "buyers" pursuant to the WVCCPA.

125.    LifeLock is a "Credit Services Organization" ("CSO") pursuant to the WVCCPA as it represents that it can or will provide advice or assistance to subscribers in improving their credit record, history, or rating.

22

126.    LifeLock charged Plaintiff and the putative class money before completing performance of all services the credit services organization agreed to perform on their behalf.

127.    LifeLock made and used false and misleading representations in the offer or sale of its services as a CSO.

128.    LifeLock engaged, directly or indirectly, in unfair or deceptive acts, practices, and courses of business in connection with the offer or sale of its services as a CSO.

129.    Defendants advertised LifeLock's services as a CSO without filing a registration statement with the West Virginia Secretary of State.

130.    LifeLock, as a CSO, failed to file the requisite registration statement with the West Virginia Secretary of State.

131.    LifeLock, as a CSO, failed to make the appropriate written disclosure statements to plaintiff and the putative class before executing contracts or agreements with, or receiving money from Plaintiff or the putative class.

132.    LifeLock, as a CSO, failed to enter into the required form written contracts or agreements with Plaintiff or the putative class.

## **THIRD COUNT**

### **[Unconscionability]**

133.    Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

134.    Defendants' conduct in the advertising, marketing and sale of its services and/or goods is unconscionable as a matter of law.

135.    In addition, the exculpatory provisions contained in Defendants' "Terms and Conditions" are unconscionable as a matter of law.

## FOURTH COUNT

### [Injunctive Relief]

136. Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

137. As a result of the foregoing, and because money damages are inadequate to fully compensate Plaintiff and others similarly situated, or to prevent further instances of the future violations, preliminary and permanent injunctive relief is warranted as follows:

(a) LifeLock shall cease advertising its services in West Virginia, unless and until all advertisements are revised to include language that is neither deceptive or misleading; and

(b) LifeLock shall be permanently enjoined from implementing the marketing scheme described herein or incorporated by reference.

## FIFTH COUNT

### [Declaratory Judgment]

138. Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

139. In addition to the extremely one-sided terms included in its form adhesive "Terms and Conditions," LifeLock has included procedural obstacles, which intend to discourage claims against it and/or attempt to shield it from any liability.

140. These provisions are unenforceable.

141. The provisions include, *inter alia*:

(a) Paragraph "11" requiring that all claims or disputes against LifeLock be governed by the laws of the State of Arizona; and

(b)     Paragraph "12" requiring that: (i) any disputes or controversies arising from the "Terms & Conditions," against LifeLock, be settled by confidential arbitration; (ii) the subscriber agree not to participate in any dispute against LifeLock as a class representative or as a member of a putative class; and (iii) the subscriber pay his or her attorney's fees and costs.

142.    The onerous provisions in the form adhesive franchise agreement are violative of West Virginia public policy and shall be declared void and unenforceable.

143.    Plaintiff is therefore entitled to a declaration from the Court that the LifeLock "Terms and Conditions," are void and unenforceable, or in the alternative, the Court shall strike those provisions that are unenforceable.

## PRAYER

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, respectively prays for the following relief:

1.      That the Court enter an Order certifying the proposed class herein and appointing Plaintiff and the undersigned counsel of record to represent the class;

2.      That the Court enter an Order rescinding the LifeLock subscription of Plaintiff and each and every member of the putative class based on Defendants' fraudulent inducement thereof or, alternatively, damages for said fraudulent conduct;

3.      That the Court issue a preliminary injunction enjoining Defendants and all others, known and unknown, from continuing to engage in unlawful conduct as set forth in this Complaint;

4.      That the Court issue a permanent injunction enjoining Defendants and all others, known and unknown, from continuing to engage in unlawful conduct as set forth in

this Complaint;

5.     That the Court enter a declaratory judgment, pursuant to *W. Va. Code* §55-13-1, *et seq.*, declaring the "Terms & Conditions" entered into by Plaintiff and each and every member of the putative class unconscionable and, therefore, unenforceable; or in the alternative, sever the portions of the "Terms and Conditions" that the Court deems unconscionable and unenforceable, and enforcing the remaining valid portions of the "Terms and Conditions;"

6.     That the Court enter a declaratory judgment, pursuant to *W. Va. Code* §55-13-1, *et seq.*, declaring the acts of Defendants to be in violation of the WVCCPA;

7.     That Plaintiff, and each member of the putative class, be awarded actual damages for each violation of the WVCCPA;

8.     That Plaintiff, and each member of the putative class, in addition to any actual damages, be awarded a statutory penalty pursuant to *W. Va. Code* §46A-5-101, as adjusted for inflation, for each violation of the WVCCPA;

9.     That Plaintiff, and each member of the putative class, be awarded actual damages or two hundred dollars, whichever is greater, for each violation of the WVCCPA pursuant to *W. Va. Code* §46A-6-106;

10.     That Plaintiff, and each member of the putative class, be awarded additional damages against Defendants, in an amount to be determined at trial, that would fairly and reasonably compensate them for any and all moneys lost as a result of Defendants' acts;

11.     That Plaintiff, and each member of the putative class, be awarded additional damages against Defendants, in an amount to be determined at trial, that would fairly and reasonably compensate them for, *inter alia*, the aggravation, annoyance and inconvenience

26

suffered by them as a result of Defendants' acts;

12.     That Plaintiff, and each member of the putative class, be awarded punitive damages against Defendants, in an amount to be determined at trial, for the willful, wanton and/or reckless disregard for their legal rights;

13.     That Plaintiff, and each member of the putative class, be awarded costs and a reasonable attorney's fee, pursuant to the WVCCPA and/or the general authority of this Court;

14.     That Plaintiff, and each member of the putative class, be awarded any and all additional compensatory, incidental and consequential damages, in an amount to be determined at trial;

15.     That Plaintiff, and each member of the putative class, be awarded prejudgment and post-judgment interest on any and all of the foregoing damages, and such further and general relief – both legal and equitable – as this Court may deem appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL OF ALL ISSUES SO TRIABLE.**

**KEVIN GERHOLD, on behalf of himself and all others similarly situated,**
Plaintiff
By Counsel

David L. Grubb (State Bar No. 1498)
Kristina Thomas Whiteaker (State Bar No. 9434)
Wendy E. Radcliff (State Bar No. 9522)
**THE GRUBB LAW GROUP**
1324 Virginia Street, East
Charleston, WV 25301
304/345-3356 (telephone)

David S. Paris
Justin M. Klein
**MARKS & KLEIN, LLP**
63 Riverside Avenue
Red Bank, NJ 07701
732/747-7100 (telephone)
Admission Pending

27